# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE: SUBPOENA TO LINCOLN
INTERNATIONAL LLC

In connection with:
*Panini America, Inc. v. Fanatics, Inc.*, No. 23-
cv-9714 (S.D.N.Y.)

Case No. _____

## FANATICS' MOTION TO COMPEL COMPLIANCE WITH DOCUMENT SUBPOENA PURSUANT TO FED. R. CIV. P. 45

Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i), Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc. (together, "Fanatics") bring this motion to compel Lincoln International LLC ("Lincoln U.S.") to comply with a subpoena for documents ("Subpoena") served by Fanatics that requires compliance in this District.

## I.      INTRODUCTION

Lincoln U.S. refuses to comply with the Subpoena, claiming that the requested documents reside only with its Italian affiliate, Lincoln International S.r.l. ("Lincoln Italy"). The reality, however, is that Lincoln U.S. markets Lincoln Italy as its "Milan office," boasts to potential clients about the entities' "close collaboration" and "globally integrated" operations, the entities jointly control and freely share client information (as confirmed by their consumer privacy notices), and they have overlapping leadership, common ownership, a shared email domain, and an ongoing financial relationship. In addition, the limited documents already in Fanatics' possession confirm that Lincoln U.S. not only can—but actually did—obtain information responsive to the Subpoena from Lincoln Italy on at least one occasion. Thus, the requested documents are clearly within the possession, custody, or control of Lincoln U.S. And regardless, Lincoln U.S. waived all of its

objections to the Subpoena by serving them nearly a month after the compliance deadline. For these reasons and others set forth below, Lincoln U.S. should be compelled to produce documents responsive to the Subpoena.

## II.     FACTUAL BACKGROUND

### A.     The Underlying Litigation And Subpoena

The Subpoena arises from antitrust litigation that Panini America, Inc. ("Panini America") filed against Fanatics,[1] which is now pending in the Southern District of New York. In that litigation, Panini America alleges that Fanatics has monopolized the purported market for "Major U.S. Professional Sports Leagues trading cards" by obtaining licensing deals with certain sports leagues and players' associations, most of which had previously granted licenses to Panini.[2]

Panini America's allegations are hypocritical, factually baseless, and legally deficient. While discovery is ongoing, Fanatics' potential defenses include, among other things, that (i) Panini America's harm was self-inflicted—rather than innovate and invest, Panini America lost the licenses by failing to compete and instead funneling money back to its Italian parent company, Panini S.p.A. (together with Panini America, "Panini") while trying to sell its business; (ii) Panini America's market definition is overly narrow and gerrymandered; and (iii) Panini America has not been harmed at all—in fact, Panini has been bragging to the world, including potential investors, about its supposed value, future prospects, and competitive prowess.[3] Industry observers have

---

[1]  Panini also named Fanatics, Inc. as a defendant, but Fanatics, Inc. no longer exists as a legal entity and has converted to Fanatics, LLC.

[2]  *See* Am. Compl. ¶¶ 12, 77, ECF No. 69, *Panini America, Inc. v. Fanatics, Inc.*, No. 23-cv-9714 (S.D.N.Y. Oct. 10, 2023) ("Antitrust Case").

[3]  *See* Fanatics' Am. Answer, Aff. Defs. (1), (13)-(14), ECF No. 230, Antitrust Case; *see also* Ex. 23 (Panini America Blog, *Panini America And Patrick Mahomes Agree To Autograph Trading Card Partnership* (Apr. 25, 2025), https://blog.paniniamerica.net/panini-america-and-patrick-mahomes-agree-to-autograph-trading-card-partnership) at 1 ("Panini America [is] the world's largest sports and entertainment collectibles

recently noted this "ironic twist: if Panini touts a multi-billion euro valuation to potential buyers, it could undermine its argument in court that Fanatics' dominance has crippled its business.  In other words, claiming a strong future to justify a high sale price may clash with its claims of being squeezed out of the market."[4]

Documents regarding a potential sale of Panini are critical to Fanatics' potential defenses, as they will demonstrate, among other things, Panini's view of the relevant market, its valuation and assessment of its business after losing certain licenses to Fanatics, and its plans for the future. Fanatics therefore served the Subpoena on October 9, 2025, requesting documents and communications regarding a potential sale, securitization, or combination of Panini's business, including pitch materials, financial projections, valuation-related materials, and related communications.  Ex. 1 (Subpoena).

### B.    Lincoln Italy's Involvement In Panini's Attempts To Sell Its Business

As of at least fall 2018, Lincoln Italy was retained by Panini S.p.A. to advise on a potential sale of Panini's business (including Panini America).[5]  Fanatics understands that the contemplated transaction was structured as a sale of 100% of the ownership interests (equity) in Panini S.p.A., and that the sales process included outreach to and discussions with numerous potential buyers based in the U.S. Panini's efforts to sell its business remain ongoing as of today, though Panini is

---

company.")); Ex. 7 (Collector Club, *Panini explores strategic options as collectible giant considers sale* (Oct. 31, 2025), https://collectorclub.co.uk/latest-news/panini-explores-strategic-options-sale) at 2.

[4]  Ex. 7 (Collectors Club, *Panini explores strategic options as collectible giant considers sale*) at 2.

[5]  Ex. 5 (BeBeez, *Panini chiuderà il 2018 con un miliardo di euro di ricavi. Mentre i soci trattano la vendita*  (Jan. 10, 2019), https://bebeez.it/private-equity/panini-chiudera-2018-un-miliardo-euro-ricavi-soci-trattano-la-vendita) at 1 ("[L]o scorso autunno i soci di Panini … hanno dato mandato a Lincoln International per individuare potenziali investitori interessati a rilevare l'azienda.") (Google Translation: "[L]ast fall Panini's shareholders … instructed Lincoln International to identify potential investors interested in acquiring the company.").

now reportedly relying on Citigroup to advise on a potential sale.[6]  Recent reporting indicates that Panini is currently valuing its business in the range of $4.5 billion—up from a reported valuation of $3 billion in July 2021, before Panini lost certain licenses to Fanatics.[7]

### C.    Lincoln International Group's "Globally Integrated" Operations

Lincoln Italy is the "Milan office" of Lincoln International Group, a "globally integrated" investment banking advisory firm founded and headquartered in Chicago, where Lincoln U.S. is based.[8]  Lincoln International Group's "tightly integrated global team" is a key selling point for potential clients and includes Lincoln Italy, which is an extension of its U.S. operations and overseen by its U.S.-based founders.[9]  Lincoln Italy's webpage boasts that its "strength comes from a very close partnership capable of global collaboration between colleagues."[10]  It further explains that "thanks to its team based in Milan, Lincoln offers the flexibility of a local team with strong roots in the territory and a global platform with direct access to all potential international

---

[6]  Ex. 7 (Collector Club, *Panini Explores Strategic Options as Collectible Giant Considers Sale*) at 1.

[7]  *Compare id.* at 2, *with* Ex. 6 (Gillian Tan, *A-Rod's Slam SPAC Said in Merger Talks With Italy's Panini Group*, Bloomberg Law (Jul. 13, 2021), https://news.bloomberglaw.com/mergers-and-acquisitions/a-rods-slam-spac-said-in-merger-talks-with-italys-panini-group) at 1 ("A transaction is set to value the combined entity at $3 billion or more.").

[8]  Ex. 19 (Lincoln, *About Us*, https://www.lincolninternational.com/about-us (last visited Dec. 10, 2025)) at 2 ("Connected Globally: We are headquartered in Chicago and connected around the world.  With more than 1,000 professionals across 15 countries, we have a global footprint with strong local presence in the world's most important markets."); Ex. 22 (Lincoln, *Worldwide*, https://www.lincolninternational.com/worldwide (last visited Dec. 10, 2025)) at 1, 4 ("globally integrated across 25+ offices in 16 countries," including Italy); Ex. 24 (Lincoln, *Saverio Rondelli*, https://www.lincolninternational.com/people/saverio-rondelli) (last visited Dec. 10, 2025)) at 1 (describing CEO of Lincoln Italy as "head of Lincoln's Milan office").

[9]  Ex. 21 (Lincoln, *Italy*, https://www.lincolninternational.com/worldwide/italy (last visited Dec. 10, 2025)) at 1 ("Our founders remain as committed to leading the firm as they were on day one, driving culture, driving strategy, investing in key client relationships and attracting and developing talent.")); *see also* Ex. 20 (Lincoln, *Firm Leadership*, https://www.lincolninternational.com/about-us/firm-leadership (last visited Dec. 10, 2025)) at 1, ("The leadership of Lincoln International includes the original founders and a team of professionals who oversee the strategy and performance of the firm globally.")); Ex. 19 (Lincoln, *About Us*) at 1.

[10]  Ex. 21 (Lincoln, *Italy*) at 1.

counterparts."[11]     Lincoln U.S. and Lincoln Italy also use the same email domain—@lincolninternational.com.[12]

In some respects, Lincoln Italy *must* partner with Lincoln U.S.  Under U.S. law, it is generally unlawful for a foreign entity to "induce or attempt to induce the purchase or sale of[] any security" in the U.S. unless it acts "through [a] registered broker or dealer."  15 U.S.C. § 78o(a)(1); 17 CFR § 240.15a-6.  Thus, to advise on potential equity sales to U.S. buyers, Lincoln Italy would need to act through a U.S.-registered broker-dealer, and Lincoln U.S. is the only U.S.-registered broker-dealer within Lincoln International Group.[13]

### D.     Lincoln U.S.'s Leaders Oversee Operations Of Lincoln Italy

Executives of Lincoln U.S.—the Chicago-based "headquarters" of Lincoln International, where Lincoln U.S.'s "founders" and most senior leaders work—oversee the firm's global operations, including in Italy.[14]  For example, Robert Barr, one of the firm's Chicago-based founders, serves as Lincoln U.S.'s Managing Director and Co-Head of Europe, as well as the Chairman of Lincoln Italy's Board of Directors and its designated legal representative.[15]  Similarly, Rob Brown, Global CEO of Lincoln U.S. and "a connected leader within the firm," "has been instrumental in building its global footprint."[16]

---

[11]  *Id*.

[12]  *Compare* Ex. 14 (Lincoln, *Robert Barr*, https://www.lincolninternational.com/people/robert-barr (last visited Dec. 10, 2025)) at 1, *with* Ex. 24 (Lincoln, *Saverio Rondelli*) at 1.

[13]  *See* Ex. 17 (FINRA, *BrokerCheck: Detailed Report*, Lincoln International LLC, https://files.brokercheck.finra.org/firm/firm_42045.pdf (last visited Dec. 10, 2025)) at 15-20.

[14]  *See supra* nn.8-9.

[15]  Ex. 14 (Lincoln, *Robert Barr*) at 1; Ex. 18 (Lincoln International S.r.l. Report) at 1, 7 (Robert Barr is Lincoln Italy's "Presidente Consiglio Amministrazione" (Chairman of the Board of Directors) and "Rappresentante dell'impresa" (designated legal representative)).

[16]  Ex. 13 (Lincoln, *Robert Brown*, https://www.lincolninternational.com/people/robert-brown (last visited Dec. 10, 2025)) at 1.

### E.     Lincoln International Group's Sharing Of Data Across Entities

Lincoln Italy's client information is directly accessible to other entities within Lincoln International Group through a centralized, firm-wide system.  Client information is held in a "joint global database" that is "used by all Lincoln International entities worldwide."[17]  Lincoln International entities "transfer … personal data within the Lincoln International Group" through this database, which "[a]ll entities within [] Lincoln International [] jointly control."[18]

Lincoln International Group's affiliated entities, including Lincoln Italy, routinely share and transfer client and third-party transactional and advisory information among themselves. Lincoln International Group's Global Consumer Privacy Notice explains that clients' "personal data may be transferred to and processed in other countries where laws governing the processing of your personal data may be less stringent than the laws in your country," … including "with Lincoln International offices or entities outside the EU" and "where there is an international dimension to the matter in which we are advising you."[19]  This personal data includes "Client Data" and "Third-Party Data."[20]

### F.     Lincoln U.S.'s Direct Involvement In The Panini Engagement

The limited documents available to Fanatics at this juncture confirm that Lincoln International Group leveraged its globally integrated operations in connection with the potential sale of Panini.  Namely, Rob Brown (Lincoln U.S.'s Chicago-based Global CEO) facilitated discussions between an advisor for a potential U.S. buyer and Lincoln Italy, including by sharing

---

[17]  Ex. 12 (Lincoln, *CRM Data Privacy Notice* (Oct. 30, 2025), https://www.lincolninternational.com/wp-content/uploads/CRM-Data-Privacy-Notice-FINAL-04.23.25-002.pdf) at 1.

[18]  *Id.* at 1-2.

[19]       Ex. 11 (Lincoln, *Global Consumer Privacy Notice* (May 16, 2025), https://cdn.lincolninternational.com/wp-content/uploads/Global-Consumer-Privacy-Notice-FINAL-05.16.25-002.pdf) at 5.

[20]  *Id.* at 2.

Panini's confidential financial performance and valuation information, which he received upon request from the CEO of Lincoln Italy.  Ex. 4 (Feb. 3, 2021 Brown email).

> ### G.    Lincoln U.S. Refuses to Comply with the Subpoena but Fails to Timely Object

Lincoln U.S. did not object to the Subpoena by the compliance date (October 30, 2025). Ex. 1 (Subpoena).  Instead, Lincoln U.S.'s counsel requested that the Subpoena be withdrawn because Lincoln U.S. and Lincoln Italy are merely "sister entities" and "no officer/employee of Lincoln International LLC had any involvement in the engagement between Panini and Lincoln International S.r.l." Ex. 3 at 12-13 (meet and confer correspondence).  At the same time, Lincoln U.S.'s counsel admittedly could not confirm whether Lincoln U.S. had "documents responsive to the subpoena in its possession, custody or control" or could obtain them from Lincoln Italy upon request.  *Id.* at 4, 7, 11-13.  On November 26—almost a month after the compliance deadline— Lincoln U.S. purportedly served objections, including various boilerplate objections that its counsel had never previously raised.  *Id.* at 3-5; Ex. 2 (R&Os).  On December 4, Lincoln U.S. agreed to search "its [own] records" for responsive documents, while still refusing to search Lincoln Italy's documents. Ex. 3 at 1-2.

## III.    LEGAL STANDARD

In response to a subpoena, a non-party is "required to produce documents that are within its 'possession, custody, or control.'" *Meridian Labs., Inc. v. OncoGenerix USA, Inc.*, 333 F.R.D. 131, 135 (N.D. Ill. 2019) (quoting Fed. R. Civ. P. 34(a)(1)); *see also* Fed. R. Civ. P. 45(a)(1)(A)(iii).  A U.S. entity has "control" of a foreign affiliate's documents if the entity is "able to obtain the documents in question."  *Meridian Labs.*, 333 F.R.D. at 136 (citation omitted); *e.g., Life Spine, Inc. v. Aegis Spine, Inc.*, 2020 WL 2219060, at *2-4 (N.D. Ill. May 7, 2020) (ordering U.S. entity to comply with subpoena seeking documents in possession of foreign parent); *Appleton*

*Papers Inc. v. George A. Whiting Paper Co.*, 2009 WL 2408898, at *3-4 (E.D. Wis. July 31, 2009) (same).

Courts in this District balance the following factors to determine whether control over a foreign affiliate's documents exists: (1) "commonality of ownership"; (2) "exchange or intermingling of directors, officers, or employees"; (3) "the exchange of documents in the ordinary course of business"; (4) "the non-party's connection to the transaction at issue"; (5) "any benefit or involvement by the non-party corporation in the litigation"; (6) "the corporate party's marketing and/or servicing of the non-party company's products"; and (7) "the financial relationship between the companies." *Meridian*, 333 F.R.D. at 135-36; *see also Ledesma v. Marriott Int'l, Inc.*, 2023 WL 2814762, at *3 (N.D. Ill. Apr. 6, 2023) ("[T]he specific form of the corporate relative involved does not matter when analyzing control under Rule 34." (citation omitted)).

Courts regularly find control established where some but not all factors support it. *See, e.g.*, *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 8935006, at *2-3 (N.D. Ill. Dec. 27, 2023) (factors 1-3 and 5 established control); *Ledesma*, 2023 WL 2814762, at *3 (factors 1, 4, and 6 established control); *Life Spine*, 2020 WL 2219060, at *3-4 (factors 1, 3-4, and 6 established control); *Meridian*, 333 F.R.D. at 136-40 (factors 2-7 established control); *Applegate v. St. Vincent Health, Inc.*, 2023 WL 11157477, at *2 (S.D. Ind. Feb. 9, 2023) (factors 1-3, 5, and 7 established control).

## IV.    ARGUMENT

The Court should compel Lincoln U.S. to comply with the Subpoena because (a) all its objections are waived, (b) the above factors easily establish its control over the requested documents, and (c) its other objections are baseless.

### A.    Lincoln U.S.'s Objections Are Waived

A third party's failure to serve objections before the compliance date amounts to waiver under Rule 45.  Fed. R. Civ. P. 45(d)(2)(B) ("The objection **must be served** before the earlier of the time specified for compliance or 14 days after the subpoena is served." (emphasis added)); *see Appleton*, 2009 WL 2408898, at *1 (compelling production of foreign affiliate's documents after finding U.S. entity waived objections by serving them two weeks late); *Brogren v. Pohlad*, 1994 WL 654917, at *1 (N.D. Ill. Nov. 14, 1994) (non-party waived objections by failing to serve them with 14 days).  The Subpoena called for compliance by October 30, 2025, yet Lincoln U.S. did not serve objections until November 26, 2025.  *Compare* Ex. 1, *with* Ex. 2.  Counsel's informal email representation that Lincoln U.S. "had nothing to do with" Panini's sale efforts cannot be interpreted as an objection that Lincoln U.S. lacks control over Lincoln Italy's documents, given that counsel admittedly did not know whether Lincoln U.S. could obtain those documents upon request or had responsive documents already in its possession.  Ex. 3 at 4, 7, 12-13.  Moreover, that representation was unsigned and clearly not made "after a reasonable inquiry."  *See* Fed. R. Civ. P. 26(g) ("[E]very discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name … and must state the signer's address, e-mail address, and telephone number …. after a reasonable inquiry[.]").

Lincoln U.S. therefore waived any objections to the Subpoena and should be ordered to produce all responsive documents in its possession, custody, or control, including documents in the possession of Lincoln Italy.

### B.    Lincoln U.S. Has Control Over The Requested Documents

Even if Lincoln U.S. preserved an objection that the requested documents are outside of its control, that objection is baseless.  At least six of the seven relevant factors establish its control over documents in Lincoln Italy's possession: (1) Lincoln U.S. was directly connected to the

potential transaction in question; (2) Lincoln U.S. and Lincoln Italy exchange documents in the ordinary course of business; (3) there is substantial overlap in their senior leadership; (4) they are under common ownership; (5) they maintain an ongoing financial relationship; and (6) Lincoln U.S. markets Lincoln Italy's advisory services as part of its global platform.

       1.    <u>Lincoln U.S. is Directly Connected to the Transaction at Issue</u>

Lincoln U.S. directly participated in a key transaction at issue in this litigation—the attempted sale of Panini. Specifically, Rob Brown (Lincoln U.S.'s Global CEO) liaised with potential domestic buyers' advisors and shared non-public financial projections and valuation information obtained from Lincoln Italy in furtherance of a potential transaction. Ex. 4 at 2. This fact alone establishes that Lincoln U.S. has control of the requested documents. *See, e.g.*, *Slabaugh v. State Farm Fire & Cas. Co.*, 2013 WL 4777206, at *6 (S.D. Ind. Sept. 5, 2013) (control established where entity "demonstrated its ability to obtain the requested information and documents"); *In re Subpoena Duces Tecum to Ingeteam, Inc.*, 2011 WL 3608407, at *1 (E.D. Wis. Aug. 16, 2011) (control existed where U.S. entity "clearly collaborate[d] on the transaction at issue" with its foreign affiliate); *Life Spine*, 2020 WL 2219060, at *3 (non-party's "direct connection to the transactions at issue here" and "evidence of [affiliates'] shared business purpose" with respect to the transaction "weigh[ed] in favor of a finding of closeness").

       2.    <u>Lincoln U.S. and Lincoln Italy Exchange Documents in the Ordinary Course</u>

Lincoln International Group's public-facing policies confirm the entities share information in the ordinary course of business. As discussed above, the Group's Global Consumer Privacy Notice states that client data and third-party data may be transferred across Group entities, including those outside Europe, particularly where, as here, "there is an international dimension to

the matter."[21]  Entities within the Group store such client and third-party data in a "joint global database" that is "used by all Lincoln International entities worldwide" and which all Group entities "jointly control."[22]  Thus, Lincoln U.S. plainly has both the legal right and ability to access Lincoln Italy's documents in the ordinary course.  *See, e.g.*, *Meridian*, 333 F.R.D. at 137 (citing *Sanofi-Aventis v. Sandoz*, 272 F.R.D. 391, 396 (D.N.J. 2011)) (finding control where affiliates engaged in a "free flow of exchange of information").

This conclusion is reinforced by emails demonstrating that Lincoln U.S. and Lincoln Italy *actually did* exchange Panini's confidential information in connection with the Panini engagement. *See* Ex. 4 at 2; *Linet Americas, Inc. v. Hill-Rom Holdings, Inc.*, 2025 WL 889480, at *3 (N.D. Ill. Mar. 17, 2025) (email where U.S. entity requested documents from foreign affiliate "demonstrate[d] by itself an 'exchange of documents in the ordinary course of business'").

3.    The Leadership of Lincoln U.S. and Lincoln Italy Substantially Overlaps

Lincoln U.S. and Lincoln Italy share significant overlapping leadership—a factor that courts consistently recognize as indicative of control.  Most notably, Robert Barr—Lincoln U.S.'s Managing Director and Co-Head of Europe—is the Chairman of Lincoln Italy's Board of Directors, as well as its designated legal representative.[23]  Mr. Barr is also a majority member of Lincoln International LP—the holding company that ultimately owns both Lincoln U.S. and Lincoln Italy, demonstrating his control of both entities.[24]  More generally, Lincoln U.S.'s Chicago-based senior leaders, including Mr. Barr and Mr. Brown, oversee Lincoln Italy's strategy

---

[21]  Ex. 11 (Lincoln, *Global Consumer Privacy Notice* (May 16, 2025)) at 5.

[22]  Ex. 12 (Lincoln, *CRM Data Privacy Notice* (Oct. 30, 2025)) at 1-2.

[23]  Ex. 18 (Lincoln International S.r.l. report) at 1, 7.

[24]  Ex. 15 (Lincoln International LLC 2017 SEC Registration Report) at 3.

and operations, as described on Lincoln Italy's webpage.[25]  This overlap in leadership further illustrates control.  *See, e.g.*, *Meridian*, 333 F.R.D. at 136 (finding control where senior executives of U.S. entity served on foreign affiliate's board); *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 8935006, at *2 (finding control where executives served dual leadership roles at U.S. entity and foreign affiliate); *3D Sys. Corp. v. Miller*, 2018 WL 7350939, at *4 (S.D. Ind. Mar. 13, 2018) (plaintiff showed close relationship between U.S. entity and foreign affiliate based on overlapping senior leadership).

4.    Lincoln U.S. and Lincoln Italy Share Common Ownership

Lincoln U.S. and Lincoln Italy's common ownership further supports a finding of control. At the time Fanatics served the Subpoena, FINRA reporting indicated that Lincoln International LP directly owned and controlled both Lincoln U.S. and Lincoln Italy.[26]  In recent weeks, that reporting has been updated to reflect that Lincoln International LP is both entities' "indirect sole shareholder" and thus continues to "control" both entities.[27]  Regardless, the entities share a common owner.  And where, as here, "two companies share corporate ownership, it can hardly be said that an injustice would be worked merely if one company obtains documents from the other." *Appleton*, 2009 WL 2408898, at *2 (compelling entity to produce documents held by affiliate that had same corporate parent).

5.    Lincoln U.S. and Lincoln Italy Have a Financial Relationship

Lincoln U.S.'s SEC filings confirm that Lincoln U.S. and Lincoln Italy have an ongoing financial relationship.  Lincoln U.S.'s audited annual reports reflect receivables from Lincoln Italy,

---

[25]    *See supra* nn.9-10.

[26]    Ex. 16 (Oct. 21, 2025 FINRA BrokerCheck Report: Lincoln International LLC) at 20.

[27]    Ex. 17 (Dec. 3, 2025 FINRA Brokercheck Report: Lincoln International LLC) at 19.

demonstrating that it provides services to its affiliate.[28]  For 2021—when Lincoln Italy was actively soliciting buyers for Panini—Lincoln Italy owed Lincoln U.S. $150,000 in inter-company debt.[29]  Courts have recognized that such inter-company financial arrangements support a finding of closeness.  *See, e.g.*, *Applegate*,  2023 WL 11157477, at *2 (affiliates' financial relationship supported finding of closeness where their tax forms disclosed intercompany debt); *Meridian*, 333 F.R.D. at 139 (entities' financial relationship supported finding of closeness where U.S. entity assisted affiliate's "dealings in the United States" and was reimbursed by affiliate).

6.    Lincoln U.S. Markets Lincoln Italy's Services

Lincoln U.S. actively markets Lincoln Italy's advisory services as part of its own global platform, further supporting a finding of control.  Lincoln U.S. maintains and controls the firm's global website and associated subpages, which market the Lincoln International Group to potential clients and employees.  On that website, Lincoln U.S. holds out Lincoln Italy as its "Milan office" and part of Lincoln U.S.'s "globally integrated" advisory practice and "tightly integrated global team," whose "strength comes from a very close partnership capable of global collaboration between colleagues."[30]  The website boasts of Lincoln Italy's capabilities, explaining that "thanks to its team based in Milan, Lincoln offers the flexibility of a local team with strong roots in the territory and a global platform with direct access to all potential international counterparts" and highlights recent transactions that Lincoln Italy helped steward to completion.[31]

---

[28]   *See, e.g.*, Ex. 10 (Lincoln Int'l LLC, Annual Audited Report (Form X-17A-5) (Feb. 14, 2025)) at 6-7; Ex. 9 (Lincoln Int'l LLC, Annual Report (Form X-17A-5) (Feb. 16, 2024)) at 7; Ex. 8 (Lincoln Int'l LLC, Annual Report (Form X-17A-5) (Feb. 11, 2022)) at 7.

[29]   Ex. 8 (Lincoln Int'l LLC, Annual Report (Form X-17A-5) (Feb. 11, 2022)) at 7.

[30]   Ex. 22 (Lincoln, *Worldwide*) at 1; Ex. 21 (Lincoln, *Italy*) at 1; Ex. 19 (Lincoln, *About Us*) at 1; Ex. 24 (Lincoln, *Saverio Rondelli*) at 1.

[31]   Ex. 21 (Lincoln, *Italy*) at 1-3.

Courts have recognized that marketing efforts like those Lincoln U.S. provides for Lincoln Italy support a finding of control. *See, e.g., In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 8935006, at *3 (marketing factor supported finding of control where U.S. entity advertised European affiliate's products on its website); *Linet Americas*, 2025 WL 889480, at *3 (marketing factor supported finding of control where non-party provided "marketing and communications geared towards its North American market" where plaintiff sold its products).

*    *    *

As set forth above, six of seven relevant factors support a finding that Lincoln U.S. has control of documents held by Lincoln Italy.[32]

### C.    Lincoln U.S.'s Other Objections Fail

Even if Lincoln U.S.'s other objections are preserved, they are without merit. *First*, Lincoln U.S. objects that production would require disclosure of confidential information protected by third-party agreements. Ex. 2 at 3. But the operative protective order in the underlying litigation, which was attached to the Subpoena, addresses any confidentiality concerns. Ex. 1 at ex. B; *see In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6413199, at *3 (N.D. Ill. Dec. 6, 2018) (compelling production because non-party "ha[d] not shown the protections contained in the Confidentiality Order are inadequate to protect its interests").

*Second*, Lincoln U.S. objects that production would conflict "with GDPR and related data-protection laws." Ex. 2 at 2. But even if that objection were timely, Lincoln U.S. would have to carry its "burden of showing such law bars production." *In re Mercedes-Benz Emissions Litig.*,

---

[32] Fanatics believes that the evidence set forth herein is more than sufficient to conclude that Lincoln U.S. has control of documents held by Lincoln Italy. However, if the Court is inclined to deny this motion, Fanatics is prepared to serve a subpoena for a deposition of a corporate representative of Lincoln U.S. on the topic of whether Lincoln U.S. has control of documents held by Lincoln Italy and would request the opportunity to renew the motion based on that testimony.

2020 WL 487288, at *6 (D.N.J. Jan. 30, 2020) (quotation omitted).  And Lincoln U.S. cannot claim that international privacy laws are implicated when it has not even searched for responsive documents.  This objection is also at odds with Lincoln International Group's privacy policies, which indicate the information sought here is subject to transnational disclosure and exchange.

*Finally*, Lincoln U.S. broadly objects that the Subpoena requests are overbroad, duplicative, disproportionate, and cumulative of party discovery.  Ex. 2 at 2.  Those objections are baseless.  Fanatics' requests are narrowly tailored to a single subject that is critical to the underlying litigation—Panini's efforts to sell its business.  Lincoln U.S. does not dispute that it has unique responsive documents—nor could it, having served as Panini's advisor on a potential sale for many years.  The Subpoena's narrow subject matter would easily allow Lincoln U.S. to craft targeted search terms to capture responsive documents.  In fact, many of the documents sought (*e.g.*, investor presentations and valuation materials) are likely to be stored in central folders that require no custodial searching.  *See, e.g.*, *Simon v. Nw. Univ.*, 2017 WL 467677, at *10 (N.D. Ill. Feb. 3, 2017) (burden on producing party reduced given certain "documents are likely maintained in a central location, and will not require extensive searching").  And Lincoln U.S. and Lincoln Italy use the same email domain—@lincolninternational.com—so there is no reason to believe that searching Lincoln Italy's emails would entail any extra burden.  *Compare* Ex. 14, *with* Ex. 24.  Regardless, any attendant burden would be justified, given the importance of the requested documents and the amount in controversy, which Panini claims to be "billions" of dollars.

## V.    CONCLUSION

For these reasons, Fanatics respectfully asks that the Court compel Lincoln U.S. to comply with the Subpoena—including by searching for and producing Lincoln Italy's responsive documents—and grant Fanatics any other relief to which it is entitled.

\*      \*      \*

Pursuant to Local Rule 37.2, Fanatics' counsel held two telephonic conferences with Lincoln International LLC's counsel, on October 21, 2025, and October 30, 2025. Ted Ovrom (counsel for Fanatics) and Vanessa Tiradentes (counsel for Lincoln International LLC) participated in both telephonic conferences. The parties also conferred extensively by email between October 20, 2025, and December 2, 2025. Despite counsels' good faith efforts, the parties were unable to reach agreement on Lincoln International LLC's obligations to comply with the Subpoena.

Dated: December 10, 2025                QUINN EMANUEL URQUHART
                                                 **& SULLIVAN LLP**

                                                 */s/ Michael B. Carlinsky*
                                                 Michael B. Carlinsky
                                                 Kathryn D. Bonacorsi*
                                                 Ted Ovrom
                                                 295 Fifth Avenue, 9th Floor
                                                 New York, NY 10016

                                                 Derek L. Shaffer*
                                                 1300 I Street NW, 9th Floor
                                                 Washington, DC 20005

                                                 Bevin Brennan
                                                 191 N. Wacker Drive, Suite 2700
                                                 Chicago, IL 60606

                                                 *\*Pro hac vice* forthcoming

                                                 *Attorneys for Fanatics*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that a true and correct copy of Fanatics' Motion to Compel Compliance with Document Subpoena was served on counsel for all parties by direct email and via the Court's CM/ECF filing system on December 10, 2025.

*/s/ Michael B. Carlinsky*